FILED

APR 15 2019

Clerk, U S District Court
District Of Montana
Billings

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MANUEL PAZ SANCHEZ, JR. *aka* *Manuel Sanchez Paz, Jr.*,<br><br>Defendant. | CR 18-03-BLG-SPW<br><br>OPINION AND ORDER |

Before the Court is Defendant Manuel Paz Sanchez, Jr.'s motion to suppress evidence seized from his rental vehicle. (Doc. 58). For the following reasons, Sanchez's motion is denied.

I. **Facts**

On the morning of December 12, 2017, Montana Highway Patrol Trooper Barry Kilpela was heading eastbound on Interstate 90 when he came upon a car following about two car lengths behind a semi-truck trailer. Kilpela testified that he estimated the semi was traveling somewhere between 65 and 70 miles per hour. The posted speed limit in the area was 65 miles per hour for trucks and 80 miles

1

per hour for cars. As Kilpela passed the car and the semi-trailer, he noticed that the car was still traveling very closely behind the semi. For approximately two miles, Kilpela watched in his rearview mirror to see if the car would pass the trailer as he had. When it did not, Kilpela pulled into a median and picked a stationary spot from which he could determine if the car was still traveling too closely behind the semi. As the semi passed the stationary spot he had picked, Kilpela counted one second before the car passed the same spot. Based on his training, Kilpela testified that he believed a three-second delay between the semi and the car would have been a reasonable distance.

Kilpela pulled Sanchez over for following the semi too closely. (Doc. 62-1 at 1). When Kilpela approached the car and explained why he had stopped Sanchez, Sanchez agreed that he was following the semi too closely but did not pass or exit the interstate because he did not want Kilpela to think he was avoiding him. When Kilpela asked for the car registration, Sanchez provided him with the rental contract for the car. Kilpela noticed that the car had been rented out of Sacramento, California, and was already due back. He also noticed a blanket and a pillow in the back seat of the car. (*Id.* at 2). Kilpela testified that these facts raised his suspicion because he knew that a lot of drug trafficking originated from Sacramento and he knew that rental cars were often used for drug trafficking

2

because of their reliability and because the trafficker does not risk his own car being seized in the event of an arrest.

Kilpela asked Sanchez to accompany him to the patrol car while Kilpela filled out a traffic warning. While Kilpela looked over Sanchez's rental contract, Sanchez told Kilpela that he had been visiting family in Idaho for three days but was on his way to Bismarck, North Dakota, to catch a flight back to Sacramento. (*Id.* at 2). He told Kilpela that his wife wanted him home right away and had found a cheap flight out of North Dakota to Sacramento. Task Force Officer Sonny Smith and Sergeant Troy Muri arrived on the scene. Smith approached Sanchez's window and asked Sanchez where he had stayed the night prior. Sanchez replied that he had visited "Yogi Bear" in Yellowstone National Park. (*Id.*)

Kilpela testified that he found it implausible that Sanchez had rented the car in Sacramento, traveled to Idaho to visit family for three days, overnighted in his car in Yellowstone National Park and stayed in a motel all since the car had been rented, just 72 hours prior. Kilpela also thought it was odd that Sanchez would drive from Idaho to Bismarck to save money and catch a flight home, considering it likely would have been cheaper and faster to fly or drive from Idaho to Sacramento. (Doc. 62-1 at 2). When Sanchez was asked if he had any criminal history, Sanchez responded that he had been arrested for "accessory to 187." 187

3

is law enforcement code for murder. Considering this information all together, Kilpela began to suspect Sanchez was involved in major criminal activity. (*Id.*).

Kilpela returned the rental papers to Sanchez and issued him a warning for Following Too Closely. (*Id.*) Kilpela asked Sanchez if he was carrying any drugs or illegal items in the car. Sanchez said no. Kilpela asked Sanchez if he would consent to a vehicle search. Sanchez agreed verbally and in writing.

Kilpela stayed in the patrol car with Sanchez as Smith and Muri began the search. Muri began searching the trunk and Smith began searching the front seat and console. Smith found a tire repair kit in the front seat. Kilpela testified that this was unusual for someone with a rental car because renters typically do not repair rental car tires. Muri removed the spare tire from the trunk. Kilpela, Smith and Muri each picked up the spare tire and all agreed that it was heavier than most spare tires. Kilpela testified that he also noticed that the tire exhibited irregularities when he bounced it on the ground. (Doc. 62-1 at 2).

Kilpela deployed his drug dog, Mika, around the car. Mika showed alert behavior on the trunk area. When presented with the spare tire, she showed distinct alert behavior by scratching and biting at the tire and then she sat down, indicating the odor of narcotics was coming from the spare tire. (*Id.*; Doc. 63 at 8:29:30-33).

Next, Kilpela performed an "echo test" of the spare tire using a stethoscope and a mallet. His test results indicated that some object was inside the tire. Based on the outcome of this test, Kilpela believed that there was obstruction of the airspace within the tire and that narcotics were likely inside. (Doc. 62-1 at 2).

Smith explained law enforcement's suspicions to Sanchez that narcotics were contained in the tire. Smith asked for Sanchez's consent to drive the car to a tire shop and have the tire shop take the tire off its rim, so they could look inside. Sanchez consented to these actions. (Doc. 63 at 8:33:54-8:34:09). Smith drove the rental car to a nearby tire shop. When the tire was removed from the rim, Smith and Kilpela discovered just over eight pounds of methamphetamine inside. (Doc. 62-1 at 3).

## II. Discussion

Sanchez makes three arguments in support of suppression: (1) the stop was without reasonable suspicion; (2) the stop was unconstitutionally prolonged beyond the scope of issuing a traffic citation; and (3) the scope of Sanchez's consent to the search was exceeded by the removal of the tire from its rim.

### 1. Kilpela had reasonable suspicion that Sanchez was following the semi-truck too closely.

To stop a vehicle, police must have a reasonable suspicion supported by articulable facts that criminal activity may be afoot. *United States v. Lopez-Soto*, 205 F.3d 1101, 1104-05 (9th Cir. 2000). Reasonable suspicion requires "a

particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). In the context of stopping a vehicle, an officer's reasonable suspicion that a traffic violation occurred will suffice. *United States v. Willis*, 431 F.3d 709, 715 (9th Cir. 2005).

Sanchez argues that Kilpela did not have a legitimate justification for pulling him over: "the stop in this case does not have as required underpinnings any articulable facts that [Sanchez] was following a tractor-trailer unit too closely or unsafely." (Doc. 58-1 at 3).

The Montana statute for following too closely states:

> The driver of a motor vehicle may not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the roadway.

Mont. Code Ann. § 61-8-329(1). Kilpela's report states that Sanchez was less than one second behind the semi. (Doc. 62-1 at 1). Based on his observation, he felt this was an unsafe distance. *United States v. Miranda-Guerena*, 445 F.3d 1233, 1237 (9th Cir. 2006) (holding that personal observation of traffic violations gives rise to reasonable suspicion permitting a traffic stop). Sanchez apparently agreed that he was following too closely, because he admitted as much to Kilpela during the stop. (Doc. 62-1 at 1). The Court finds that Kilpela had reasonable suspicion to believe Sanchez had committed the traffic violation of following too closely.

6

## 2. The stop was not unconstitutionally prolonged because Sanchez consented to the search immediately after the traffic stop ended.

If a person is stopped for violating the traffic code, the stop may not be prolonged beyond the time reasonably required to complete the mission of the stop. *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate that purpose." *Id.* at 1614. Authority for the stop ends when tasks tied to the traffic infraction are, or reasonably should have been, completed. *Id.* Such tasks typically include checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Id.* at 1615. In addition, passengers may be ordered to exit the vehicle, asked to produce ID, and questioned about travel. *United States v. Betancourt*, 277 Fed.Appx.708 (9th Cir. 2008); *United States v. Williams*, 419 F.3d 1029, 1031 (9th Cir. 2005).

An initially legal traffic stop may become illegal if inquiries into matters unrelated to the justification for the stop unreasonably prolong it. *United States v. Turvin*, 517 F.3d 1097, 1103-04 (9th Cir. 2008). However, as long as the stop is not unreasonably extended, officers may ask questions unrelated to the purpose of the

stop, even without reasonable suspicion for the questions. *United States v. Mendez*, 476 F.3d 1077, 1081 (9th Cir. 2007).

Sanchez contends Kilpela stopped the vehicle for following too closely and unconstitutionally prolonged the stop beyond that purpose. Sanchez is incorrect. Kilpela obtained Sanchez's license and rental contract. Kilpela's suspicions were aroused by the fact that Sanchez was coming from Sacramento, in a rental car, and had a blanket and pillow to apparently sleep in the car. Kilpela's suspicions were heightened after he questioned Sanchez about where he was going. Kilpela noticed discrepancies in Sanchez's story and that the rental car was due in Sacramento, but Sanchez was heading to North Dakota. All these questions and tasks were appropriate to the stop. *Rodriguez*, 135 S.Ct. at 1615. Sanchez's responses to Kilpela's inquires raised Kilpela's suspicion that Sanchez was involved in drug trafficking.

Fourteen minutes elapsed from the time Kilpela stopped Sanchez to the point he asked for consent to search. (*See* Doc. 63 at 8:08-8:22, *Kilpela in-car video*). Immediately after issuing Sanchez the traffic warning, Kilpela asked for, and received, valid consent from Sanchez to search the car. Sanchez provided both verbal consent and signed a consent to search form. (Doc. 62-1; 62-4). Sanchez has not provided any evidence that he was coerced, or his consent was somehow involuntary. No evidence suggests that Kilpela's conduct was coercive: Kilpela did

not draw his gun, use force, or handcuff Sanchez. Kilpela did not imply that he had the authority to search with or without Sanchez's consent. Sanchez voluntarily consented, and, at no point did Sanchez object to the duration of the search or ask that the search end. *See United States v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994) (holding that "[f]ailure to object to the continuation of a vehicle search after giving general consent to search is properly considered as an indication that the search was within the scope of the initial consent.").

It appears from the videotape and courtroom testimony that the duration of the stop fell well within the time-period found to be reasonable in this circuit, *see Turvin*, 517 F.3d at 1101 (holding an ordinary traffic stop could reasonably take 14 minutes). Also, more importantly, the duration of the stop was entirely justified by "the ordinary inquiries incident to such a stop," considering the conflicting information Sanchez provided. *Illinois*, 543 U.S. at 408. Accordingly, the Court rejects Sanchez's challenge to the duration of his stop.

   3. **Sanchez consented to Kilpela's search of the tire, so the scope of his consent was not exceeded by the removal of the tire from its rim.**

Sanchez contends that law enforcement exceeded the scope of consent given by removing the spare tire and transporting it and him to the tire shop, removing the tire from the rim and inspecting its contents. (Doc. 58-1 at 6). The government

argues that because Sanchez consented to these actions the search did not exceed the scope of his consent. (Doc. 62 at 14). The Court agrees with the government.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Courts should consider the whole factual context of the search when deciding whether it exceeded the scope of consent. *United States v. Russell*, 664 F.3d 1279, 1282 (9th Cir. 2012). The permissible scope is generally defined by its expressed object. *Jimeno*, 500 U.S. at 251. When somebody consents to the search of a car, that consent is construed broadly to include the search of containers contained within the car. *Id.* As the Supreme Court recognized, "[c]ontraband goods rarely are strewn across the trunk or floor of a car." *Id.* (quoting *United States v. Ross*, 456 U.S. 798, 820 (1982)). Therefore, when somebody consents to a search of their car for contraband, he should expect the officers to search compartments and containers within the car. This includes the interior of the car, the glove box, and the trunk. *Cannon*, 29 F.3d at 477.

For example, in *United States v. McWeeney*, an officer stopped a car for a reason unrelated to the ultimate charge. 454 F.3d 1030, 1032 (9th Cir. 2006). After the passengers denied having anything that "they were not supposed to

have," the officer asked them "if they minded if he looked in the car." *Id.* (modifications omitted). The passengers consented. *Id.* at 1032-33. After examining the passenger compartment, the officer opened the trunk. *Id.* at 1033. The officer noticed that the trunk's carpet was loose. *Id.* He pulled the carpet back and found an illegally-possessed handgun. *Id.*

The Court found the officer did not exceed the defendant's general consent by searching the trunk. *Id.* at 1034. The Court found that a reasonable person would understand that the officer would look for weapons and narcotics. *Id.* at 1035. With that knowledge, "the reasonable person would expect him to search the trunk and look under loose carpet." *Id.*

The Ninth Circuit reached a similar result in *United States v. Gutierrez-Mederos*, 965 F.2d 800 (9th Cir. 1992). In *Gutierrez-Mederos*, an officer stopped the defendant for an improper lane change. *Id.* at 802. The officer asked if any drugs or weapons were in the car, to which the defendant answered negatively. *Id.* The defendant consented to a search. *Id.* The officer removed keys from the hatchback lock and used them to open a side compartment panel inside the hatchback area. *Id.* Inside the compartment, the officer noticed a loose cardboard divider. *Id.* The officer pulled the divider away and discovered drugs and guns. *Id.*

11

The Court found that the search did not exceed the scope of consent. *Id.* at 803. The defendant knew that the officer was looking for guns and drugs, and therefore gave consent for the officer to search any area that could contain contraband. *Id.* at 803-04. A reasonable person would expect the officer to look inside the compartments. *Id.* at 804.

Like *McWeeney* and *Gutierrez-Mederos*, Sanchez understood that law enforcement intended to search for drugs. Kilpela told Sanchez he suspected Sanchez of drug trafficking and asked for consent to search the car. Kilpela also asked Sanchez if he could run the drug dog around the vehicle and, after the dog alerted on the tire, Kilpela asked Sanchez if law enforcement could search the tire. Sanchez knew that Kilpela would be looking for contraband when he consented to the search. Accordingly, Sanchez knew the officers would search any nooks and hidden compartments. Items hidden in the spare tire area are analogous to the items found in the hidden compartment in *Gutierrez-Mederos* and under the loose carpet in *McWeeney*.

Once Kilpela suspected that drugs were in the spare tire, Smith asked Sanchez to expand the scope of his consent. Specifically, Smith told Sanchez he believed there were drugs in the tire and that he wanted to take the tire to the tire shop to have it taken off the rim. Sanchez consented to these specific actions. In the video the following conversation occurs:

12

> TFO Smith: I'm gonna open [the tire] up . . . you're not under arrest right now, but we are going to detain you and get this tire open. Do I got your consent to drive the vehicle over [to the tire shop] and if there's nothin in there, there's nothin in the tire, we will get you on your way? Fair enough?
>
> Sanchez: Yeah.

(Doc. 63 at 8:33:54-8:34:09). Based on this exchange, as well as Sanchez's original consent to search, the Court finds that law enforcement did not exceed Sanchez's express grant of consent to search.

## IV. Conclusion

For the reasons discussed above, Sanchez's Motion to Suppress (Doc. 58) is DENIED.

DATED this 15th day of April 2019.

SUSAN P. WATTERS
United States District Judge